**UNITED STATES of America, Plaintiff,**

**v.**

**Angeles Ramonita GARCIA, et al., Defendants.**

**Civ. No. 78–1005.**

United States District Court,
D. Puerto Rico.

Nov. 30, 1981.

J. Rodger Edgar, Raymond E. Hopkins, Paul A. Blaine, Civ. Div., Dept. of Justice, Washington, D. C., for plaintiff.

Luis F. Abréu Elías, Río Piedras, P. R., for defendants.

**DECISION AND ORDER**

TORRUELLA, District Judge.

This case is the aftermath of two other proceedings before this Court.

In *United States v. Angeles Ramonita García*, Cr.No. 76–153, Defendant Angeles Ramonita García (hereinafter "Defendant García"), plead guilty and was convicted of conspiring to defraud the United States while engaged in a scheme involving tuitions paid by the Veteran's Administration (hereinafter "VA") to a school owned and operated by her. Subsequently, in *United States v. Angeles Ramonita García*, Civil Number 76–1417, Defendant García was adjudged indebted to the United States in the amount of $1.2 million by reason of the aforementioned scheme.

The present case reflects efforts by the United States to collect on said civil judgment by challenging the title to two condominium apartments which Plaintiff claims should rightfully be in Defendant García's name. As to the first of these apartments, Apartment 10–A, located at Condominium Laguna Terrace, # 6 Joffre St., Condado, Santurce, Puerto Rico (hereinafter "Apartment 10–A"), it is claimed by Plaintiff that Defendant García transferred title to the same to her son, Defendant Frank E. Piñeiro (hereinafter "Defendant Piñeiro"), during the period of time in which the fraudulent enterprise was in operation,[1] said transfer being without any consideration ("causa") and thus in fraud of Defendant García's creditors, namely the United States. The allegation regarding the second apartment, Apartment 12–E of the same Condominium building (hereinafter "Apartment 12–E"), is to the effect that Defendant García purchased said apartment acting as attorney-in-fact for her son and daughter, Defendants Piñeiro and Goepp[2] respectively, in whose names Defendant García caused title to be placed, with funds fraudulently obtained from Plaintiff as a result of the aforementioned scheme. The United States claims that said actions create an equitable interest on its behalf in Apartment 12–E which may be enforced by resort to the principles of a constructive trust.

After a full trial, and upon consideration of the record as a whole, this Court makes the following

## FINDINGS OF FACT

1. This is a civil action brought by the United States of America as Plaintiff.

2. Defendant has carried out business transactions within Puerto Rico, and was the named title holder of real property located in Puerto Rico which is the subject of this action.

3. Defendants Piñeiro and Goepp are named title holders of real property located in Puerto Rico which is the subject of this action.

4. Defendants Angel Rivera Colón, Sandel Felipe García, Aracelis Martínez, Flor María García, Tomás del Carmen García González, and John Doe are persons having a security interest in real property located in Puerto Rico which is the subject of this action.

5. Defendant García was, at the commencement of this action on June 2, 1978, incarcerated at the Federal Correctional Institution, Alderson, West Virginia, where she was serving a sentence imposed by this Court on November 18, 1977, following her conviction in the case of *United States v. Angeles Ramonita García*, Criminal Number 76–153 (D.P.R.).

6. Defendant García was engaged in business as the owner of Academia Puertorriqueña de Belleza (hereinafter, Academia) from approximately June 1974 until the commencement of this action on June 2, 1978.

7. Plaintiff commenced a civil action against Defendant García on November 9, 1976 under Civil Number 76–1417 of the docket of this Court to recover double its damages under the False Claims Act, 31 U.S.C. §§ 231–235, based on the allegations contained in the complaint filed in said case.

---

1. The established duration of the conspiracy as charged in the indictment to which Defendant García plead guilty was between June 1, 1974 continuing through October 19, 1976.

2. Iraida Piñeiro Goepp, herein called "Defendant Goepp."

8. As a consequence of a summary judgment entered against Defendant García in Civil Number 76–1417, Defendant García is indebted to Plaintiff as explained below.

9. On January 18, 1978, Plaintiff recovered a partial judgment against Defendant García in that action in the amount of $1,200,000.00 of which Defendant García has satisfied $494,862.55.

10. Defendant García has no economic means and is otherwise indigent.

### A—APARTMENT 10–A

11. Prior to her imprisonment, Defendant García resided at Apartment 10–A.

12. Defendant García was the registered owner of Apartment 10–A from June 6, 1963 until February 24, 1976.

13. On February 24, 1976, Defendant García conveyed title to Apartment 10–A to Defendant Piñeiro, her son, by deed No. 14, executed on the same date in Bayamón, which deed is recorded with the Registrar of Real Estate of Puerto Rico, First Section of San Juan, at folio 24, volume 483 of Santurce North.

14. The deed of conveyance from Defendant García to Defendant Piñeiro does not recite that the consideration therefor (i.e., $50,000) was paid by Defendant Piñeiro to Defendant García in the presence of the attesting notary, Rafael Pacheco Rivera.

15. In fact, consideration for the conveyance of Apartment 10–A was not paid by Defendant Piñeiro to Defendant García in the presence of the attesting notary, Rafael Pacheco Rivera.

16. Furthermore, as admitted by Defendant Piñeiro, during the course of an interview on October 5, 1976 between Defendant Piñeiro and Special Agent B. Gene Wyatt of the Federal Bureau of Investigation, Defendant Piñeiro did not pay Defendant García any of the stipulated $50,000 consideration in return for the conveyance of title to Apartment 10–A to him by Defendant García.

17. Defendant García, by her own admission, and from the evidence adduced in Criminal Number 76–153 and Civil Number 76–1417, was indebted to Plaintiff at the time of the conveyance of Apartment 10–A to her son, Defendant Piñeiro.

18. On June 28, 1976 Defendant Piñeiro executed three bearer notes, affidavit numbers 4976, 4977 and 4978, in the amount of $25,000.00 each, with interest at 8%, maturing consecutively on June 28, 1982, 1984 and 1986, which notes were secured by a mortgage deed, number 32, also executed on June 28, 1976, against Apartment 10–A, which deed is recorded with the Registrar of Real Estate of Puerto Rico at folio 24, volume 483 of Santurce North, Farm 17779, third inscription.

19. Mortgage deed number 32 was received for recording by the Registrar of Real Estate on January 31, 1977.

20. Bearer note number 4976 was cancelled on November 7, 1978, by Defendant Piñeiro acting as the executor and sole beneficiary of the estate of Norman G. Long, the original owner of that note.

21. Neither bearer notes 4976, 4977 and 4978, nor mortgage deed number 32, recite that consideration in return for the creation and tendering of any of them was paid by anyone in the presence of the attesting notary, Luis A. Maldonado Soto.

22. Defendant García was the owner of one of the remaining bearer notes, 4977 or 4978.

23. Defendant John Doe, against whom default was entered herein on September 10, 1981, was the owner of the other remaining bearer note.

### B—APARTMENT 12–E

24. On September 17, 1975, Defendant García entered an agreement to purchase Apartment 12–E from Milton and Estella Webb de Toppel for the purchase amount of $120,000.

25. The agreement to purchase Apartment 12–E was signed by Defendant García, acting with separate powers of attorney given her by Defendants Goepp and Piñeiro, to act on their behalf.

26. Defendant García provided a deposit on September 17, 1975, towards the pur-

chase of Apartment 12–E by a personal check in the amount of $6,000 which was returned to her unnegotiated on September 24, 1975, by Trans Indies Realty & Investment Corp. (hereinafter, TIRI), the broker transacting the sale of Apartment 12–E.

27. On September 24, 1975, Defendant Piñeiro provided TIRI with a cashier's check, number 187204, issued by the First Federal Savings & Loan Association of Puerto Rico (hereinafter First Federal) to Defendant Piñeiro on that date, in the amount of $25,000, which was utilized to provide the deposit towards the purchase of Apartment 12–E.

28. The above cashier's check was deposited to the credit of TIRI's escrow account (number 110891) maintained at First Federal, on September 25, 1975.

29. The source of most of the funds for the purchase of the above cashier's check was 27 checks issued by the United States Treasury, totalling $24,076.87, to payees receiving V.A. education benefits, who were at that time represented by Defendant García to V.A. as then being students enrolled at the Academia receiving educational training.

30. Each of those 27 Treasury checks bears the purported endorsement of the payee, and the actual endorsements of Defendants García and Piñeiro.

31. On November 15, 1975, First Federal issued cashier's check number 188786, payable to "Mr. Topper" (sic) in the amount of $95,000.

32. Cashier's check number 188786 was purchased in the names of Defendants Goepp and Piñeiro, utilizing as the source of the funds for such purchase, 151 checks issued by the United States Treasury, totalling $95,382.16, to payees receiving V.A. education benefits who were at that time represented by Defendant García to the V.A. as then being students enrolled at the Academia receiving educational training.

33. Each of the Treasury checks referred to in the preceding paragraph bears the purported endorsement of the payee, and the actual endorsement of Defendant García.

34. Title to Apartment 12–E was conveyed on December 1, 1975 by Milton and Estella Webb de Toppel to Defendants Piñeiro and Goepp.

35. On December 1, 1975, First Federal issued cashier's check number 189160, payable to Security National Life Insurance in the amount of $16,199.42.

36. Cashier's check number 189160 was purchased by TIRI utilizing as the source of funds for such purchase its escrow account (number 110891) maintained at First Federal.

37. In return for the conveyance of title to Apartment 12–E on December 1, 1975, Defendant García tendered First Federal cashier's check 188786 to Milton Toppel, and TIRI tendered First Federal cashier's check 189160 to Security National Life Insurance in satisfaction of the first mortgage then held by it.

38. The balance of proceeds of First Federal cashier's check 187204 was distributed as follows: $6,000 retained by TIRI as commission; $2,800.58 tendered by TIRI to Milton Toppel on December 1, 1975.

39. Deed of Sale and Purchase dated December 1, 1975, recorded with the Registrar of Real Property of Puerto Rico, First Section at folio 203, volume 479, farm number 17715 of Santurce North, conveys title to Apartment 12–E to Defendants Piñeiro and Goepp.

40. During the period between June 1, 1974 and October 19, 1976 the date of her indictment, Defendant García was knowingly involved in, participated in, and orchestrated a conspiracy to defraud the United States by fraudulently enrolling veterans at the Academia, the manner and means of which conspiracy was accomplished by falsely certifying enrollments and attendance of veterans at the Academia, and by providing illegal payments and gratuities to an employee of the V.A. Among others, Defendant García's actions included: (a) the use of advertising and the payment of a finders fee, and enrollment of more veteran students than the Academia could accom-

modate, (b) the failure by the Academia to require attendance of the veteran students enrolled and concealment of large number of absences by falsifying and misrepresenting attendance information in submissions to the V.A. including the Quarterly Certification of Attendance, the master attendance sheets and other documents, (c) the submission of false Certification of Attendance Cards (V.A. Form 22–6553a, or 21E–6553a) to the V.A. on which cards Defendant García certified that the named veteran student was absent from the Academia only on the days listed on the card during the period specified on the card, when in truth and in fact, the named veteran student had been absent in excess of the days certified by Defendant García, with the knowledge by said Defendant García that based on the statements made on the Certificate of Attendance Cards, the V.A. would issue checks to the veteran students enrolled at the Academia, (d) the backdating and falsifying, directly and through others, of the "Hoja de Asistencia" to falsely represent the attendance of veteran students, thereby concealing their non-attendance to the Academia from the V.A., (e) counseling and advising the veteran students to falsely claim dependents on V.A. Form 509, Statement of Dependency, which were submitted to the V.A., (f) counseling and advising the veteran students to conceal the backdated enrollment, the lack of attendance and the various fees charged, from the V.A., its compliance officers, its investigators and the Federal Bureau of Investigation, warning the enrollees that their benefits would be terminated if they cooperated with the above officers and employees of the United States and truthfully identified the backdated enrollment, the lack of attendance and the existence of the fraudulent fees, (g) preparing and submitting false and fraudulent information to the V.A. concerning the identity and the number of the instructors, the number of veteran students actually attending the school, and the courses actually offered by the school.

41. During the period between January 1, 1975 and March 1, 1976, Defendant García knowingly submitted false enroll-ment information to the V.A. for veteran students enrolled at the Academia.

42. During the period between January 1, 1975 and March 1, 1976, Defendant García knowingly submitted false attendance information to the V.A. for veteran students enrolled at the Academia.

43. During the period between June 1975 and November 1976, the regular pattern of attendance by veterans enrolled at the Academia varied depending on the time of the month: (a) during the first few days of each month so many veterans came to the Academia that an overflow situation existed, and it was very difficult to hold classes, (b) very few students were in regular attendance for the remainder of the month, (c) great numbers of veteran students came to the Academia during the early days of each month to collect their V.A. education benefits checks which were sent directly to the school.

44. On many occasions, Defendant Piñeiro was present at the Academia during the early days of each month to assist in the handing out of V.A. education benefits checks, and depositing receipts to accounts then maintained by Defendant García at First Federal.

45. During the period between January 1, 1975 and March 1, 1976, the Academia had two classrooms totalling 2000 square feet which were used on a regular basis.

46. During the period between January 1, 1975 and March 1, 1976, the Academia had on the average no more than nine barber chairs for instructional use.

47. During the period between January 1, 1975 and March 1, 1976 the Academia had on the average no more than 13 hair dryers for instructional use.

48. During the period between January 1, 1975 and March 1, 1976, the Academia had on the average no more than 55 students desks for instructional use.

49. During the period between January 1, 1975 and March 1, 1976, the Academia had on the average no more than six practice tables for instructional use.

50. Defendant García did not acquire additional space for students attending the Academia until approximately February, 1976, when she rented a building which used to be a kindergarten.

51. Defendant García did not replace the kindergarten furniture in the newly acquired area with that suitable for her adult students.

52. During the period September through November, 1975, between 914 and 1168 veterans were enrolled as students attending the Academia and receiving monthly educational benefits checks from V.A.

53. During the period between January 1, 1975 and March 1, 1976, in order for the veteran students to receive V.A. benefits while attending the Academia they had to have been enrolled at and attending the Academia for the time period for which retroactive benefits were requested.

54. During the period between January 1, 1975 and March 1, 1976, in order for the veterans to receive V.A. benefits while attending the Academia they were not allowed to enroll in one institution and attend classes at another without formally notifying V.A.

55. During the period between January 1, 1975 and March 1, 1976, V.A. regulations [38 C.F.R. 21.4202(b)(1) and (2) (1975)] provided that the Academia would have been disapproved for enrollment if the Academia knowingly falsified information on the veteran-student's V.A. enrollment or attendance certification forms which were completed by the Academia causing an improper payment of V.A. benefits.

56. During the period between January 1, 1975 and March 1, 1976, V.A. regulations [38 C.F.R. 21.4202(a) (1975)] provided that the Academia would have been disapproved for enrollment if the Academia charged veteran-students fees which were not charged students who did not receive V.A. benefits.

57. During the period between January 1, 1975 and March 1, 1976, as owner and directress of the Academia, Defendant García knew that if veteran students or the Academia did not comply with the regulations set forth in paragraphs 55–56 above, the veteran students would be ineligible for V.A. benefits for use at the Academia.

58. During the period between January 1, 1975 and March 1, 1976, students receiving V.A. benefits at the Academia had their enrollment certification forms backdated by the Academia so that they could receive V.A. benefits for a period of time before they had actually enrolled at the Academia.

59. During the period between January 1, 1975 and March 1, 1976, students receiving V.A. benefits paid the Academia an extra fee of approximately $100 to have their enrollment certification forms backdated.

60. During the period between January 1, 1975 and March 1, 1976 Defendant García charged the veteran students $80 a month tuition for each month their enrollment form had been backdated.

61. During the period between January 1, 1975 and March 1, 1976, Defendant García paid or caused to be paid to Ismael Rivera Vázquez, an employee at V.A. during the period January 1, 1975 through March 1, 1976, certain sums for processing V.A. forms for veteran students who would not otherwise have received V.A. benefits for attending the Academia during that same period.

62. On June 28, 1976, Defendants Piñeiro and Goepp executed five bearer notes, affidavit numbers 4971, 4972, 4973, 4974, 4975, in the amount of $25,000 each, with interest at 8%, maturing consecutively on June 28, 1977, 1978, 1979, 1980 and 1981, which notes were secured by a mortgage deed, number 31, also executed on June 28, 1976, against Apartment 12–E, which deed is recorded with the Registrar of Real Property of Puerto Rico at folio 205, volume 479 of Santurce North, farm 17715, fourth inscription.

63. The above mortgage deed was received for recording by the Registrar of Real Estate on January 31, 1977.

64. Bearer note number 4974 is owned by Defendant Angel Rivera Colón.

65. Bearer note number 4975 is owned jointly by Defendants Sandel Felipe García, Arcelis Martínez and Flor María García.

66. Bearer note 4973 is owned by Defendant Tomás del Carmen García González.

67. Bearer notes 4971 and 4972 were cancelled of record on September 26, 1978. Those notes had been owned by Defendant García.

68. Apartment 12–E has been leased to Milton Toppel since December 1, 1975 until the present, during which time he has paid rents to Defendants Piñeiro, Goepp and García.

69. Milton Toppel has paid the following rents per month during the corresponding indicated periods:

December 1, 1975 through April 1976—$800/mo.

May 1, 1976 through January 1977—$875/mo.

February 1, 1977 through December 1978—$1200/mo.

January 1, 1979 through December 1979—$1400/mo.

January 1, 1980 through December 1980—$1500/mo.

January 1, 1981 to present—$1700/mo.

## CONCLUSIONS OF LAW

A. This Court has jurisdiction over the subject matter of this action. 28 U.S.C. § 1345.

B. This Court has jurisdiction over the persons of all Defendants. Rule 4(e), Federal Rules of Civil Procedure; 32 L.P.R.A., Rule 4.7(a).

### I. APARTMENT 10–A

■ C. The conveyance of Apartment 10–A by Defendant García to Defendant Piñeiro was made without consideration ("causa") being provided therefor. 30 L.P.R.A. § 65; *Sosa v. Fidalgo*, 56 P.R.R. 48, 51–53 (1940); *Colón v. Schluter*, 48 P.R.R. 859 (1935); *García v. Banco Popular*, 39 P.R.R. 769 (1929); *Santini Fertilizer, Inc. v. Burgos*, 34 P.R.R. 830, 832–833 (1926).

D. Defendant García was Plaintiff's debtor at the time of the conveyance. *Nine v. Avilés*, 53 P.R.R. 471, 475 (1938).

E. Plaintiff was injured by the conveyance since Plaintiff has no other means by which to recover Defendant García's indebtedness to Plaintiff inasmuch as Defendant García is without economic means. *Nine v. Avilés*, supra.

F. The conveyance of Apartment 10–A by Defendant García to Defendant Piñeiro was a fraud against Plaintiff, Defendant García's creditor. 31 L.P.R.A. § 3498; *Nine v. Avilés*, supra.

G. The conveyance of Apartment 10–A by Defendant García to Defendant Piñeiro was void for lack of consideration ("causa"), 31 L.P.R.A. § 3432; *Febres v. Febres*, 33 P.R.R. 931 (1925).

H. Plaintiff is entitled to a judgment rescinding deed number 14, and ordering a reconveyance of title to Apartment 10–A to Defendant García by Defendant Piñeiro. 31 L.P.R.A. § 3492(3); *Nine v. Avilés*, supra.

I. Plaintiff is entitled to a judgment ordering Defendant Piñeiro to account for and return to Defendant García all rents and other profits, with interest, obtained as a result of his having legal title to Apartment 10–A, against which Plaintiff's prior unsatisfied judgment against Defendant García shall constitute a lien, or, alternatively, ordering Defendant Piñeiro to indemnify Plaintiff for those amounts. 31 L.P.R.A. §§ 3496, 3499.

J. Bearer notes number 4977 and 4978 and mortgage deed number 32, are void for lack of consideration ("causa"), 30 L.P.R.A. § 65; *Santini Fertilizer, Inc. v. Burgos*, supra.

K. Plaintiff is entitled to a judgment declaring that any bearer notes secured by mortgage deed number 32, and mortgage deed number 32 itself, are invalid. 31 L.P.R.A. § 3432; *Soto v. Feliciano*, 80 P.R.R. 595, 598 (1958).

### II. APARTMENT 12–E

L. Applying principles of common law equity as generally applicable in the United

States, a constructive trust may be imposed on realty in Puerto Rico under the appropriate circumstances. See 31 L.P.R.A. § 7; *Rossy v. Superior Court*, 80 P.R.R. 705 (1958); *Luperena v. Transportation Authority*, 79 P.R.R. 438 (1956); *Fernández v. Laloma*, 56 P.R.R. 348, 357 (1940); *In Re Las Colinas, Inc.*, 294 F.Supp. 582, 606 (D.P.R., 1968).

■ M. A constructive trust may be imposed upon real property that has been acquired with funds wrongfully or fraudulently obtained from Plaintiff. V *Scott on Trusts*, § 507 (3d ed. 1967 and 1978 Supp.); *Restatement of Restitution*, §§ 166, 202, 208(1); *In Re Lela & Co., Inc.*, 551 F.2d 399, 406–407 (C.A.D.C., 1977); *United States v. King*, 469 F.Supp. 167 (D.S.C.1979); 76 Am. Jur.2d, Trusts, § 248.

■ N. A constructive trust may be imposed upon real property in the possession of third persons that has been acquired with funds wrongfully or fraudulently obtained from Plaintiff. V *Scott on Trusts*, § 514.1 (3d ed. 1967 and 1978 Supp.); *Restatement of Restitution*, § 208(1); 76 Am.Jur.2d, *Trusts*, § 257, provided said persons are not good faith purchasers or holders. See 30 L.P.R.A. § 2355.

O. Plaintiff, the constructive trust claimant, must be able to fairly, reasonably or substantially identify or quantify the extent of its equitable interest in the funds which were originally obtained from it wrongfully or fraudulently. *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935 (C.A.2, 1965); *New Amsterdam Casualty Co. v. Waller*, 301 F.2d 839, 844–845 (C.A. 4, 1962); *reversing* 196 F.Supp. 780, 786–787 (M.D.N. C.1961); 76 Am.Jur.2d, *Trusts* § 252.

P. By reason of the wrongful and fraudulent acts committed by Defendant García, as reflected in findings 40 through 43, and 53 through 61, the Academia would have been disqualified from participating in the V.A. education benefits program [38 C.F.R. § 21.4202(a) and (b)(1) and (2) (1975)], wherefore, all of the 178 Treasury checks utilized in purchasing cashier's checks 187204 and 188786 were wrongfully and fraudulently obtained from Plaintiff.

■ Q. By reason of the wrongful or fraudulent acts of Defendant García committed against the V.A. in connection with her ownership and operation of the Academia, Plaintiff is entitled to a judgment imposing a constructive trust in its favor to the extent of its fairly ascertainable interest in the 178 United States Treasury checks that were utilized as the primary source of funds in purchasing First Federal cashier's checks 187204 and 188786.

R. Defendants Piñeiro and Goepp are not bona fide purchasers for value of Apartment 12–E, because:

1. Defendant García acted as their agent, within the scope of her authority, in acquiring title to Apartment 12–E in their names, and Defendant García's knowledge of the wrongful and fraudulent manner in which the funds to purchase cashier's checks 187204 and 188786 were acquired from Plaintiff, constitutes notice thereof to Defendants Piñeiro and Goepp. Restatement (Second) of Agency §§ 263, 272 (and comment c.), 274; 76 Am.Jur.2d, *Trusts* § 270; V *Scott on Trusts*, § 476 (3rd ed. 1967 and 1978 Supp.).

2. Defendant Piñeiro knew of the use of 27 United States Treasury checks as the principal source of funds to purchase cashier's check 187204, and generally knew or had reason to know of the circumstances under which Defendant García obtained those Treasury checks. *Restatement of Restitution*, § 174; V *Scott on Trusts*, § 476 (3d ed. 1967 and 1978 Supp.); 76 Am. Jur.2d, Trusts § 271.

3. Defendants Piñeiro and Goepp paid no consideration ("causa") for the purchase of Apartment 12–E. No credibility is given by the Court to the testimony of Defendant Goepp to the contrary.

S. Defendants Piñeiro and Goepp are not third persons within the meaning of neither 30 L.P.R.A. § 59 nor 30 L.P.R.A. Sec. 2355.

T. Plaintiff has an enforceable constructive trust equitable interest in Apartment 12–E to the extent of 99.55% of its value, representing the pro rata share of the apartment's purchase price on December 1, 1975 which Plaintiff's monies funded.

U. In the alternative, the purchase of Apartment 12–E by Defendants Piñeiro and Goepp was a simulated contract [see generally *Hernández v. Sec. of the Treasury*, 86 P.R.R. 12 (1962)] for the purpose of concealing Defendant García's ill-gotten gains.

V. Such a simulated contract is null and void because of lack of consideration ("causa"), inasmuch as the proceeds used to purchase Apartment 12–E, i.e., the Treasury checks, belonged to Defendant García, and not to the purported purchasers, Defendants Piñeiro and Goepp.

W. The real purchaser of Apartment 12–E was Defendant García, with Codefendants Piñeiro and Goepp acting as feigned intermediaries or name lenders. See *Hernández v. Secretary of the Treasury*, supra, at 18–20.

X. Alternatively, if the Treasury checks used to purchase Apartment 12–E were deemed a donation from Defendant García to Defendants Goepp and Piñeiro, there is a rebuttable presumption that such a donation was made in fraud of creditors [31 L.P.R.A. Sec. 3498, first paragraph] which presumption was not rebutted by Defendants at the trial.

Y. Plaintiff is entitled to a judgment ordering that title to Apartment 12–E be conveyed to it by Defendants Piñeiro and Goepp. V *Scott on Trusts*, §§ 507, 508.1, 514.1 (3d ed. 1967 and 1978 Supp.); *Restatement of Restitution*, § 208(1).

AA. Plaintiff is entitled to a judgment ordering that 99.55% of all rents totalling at least $92,075, and any other profits obtained by Defendants Piñeiro and Goepp, jointly or individually, deriving from their having taken and held legal title to Apartment 12–E, be accounted for and tendered to Plaintiff with interest from the date such rents and profits were received by them, until paid. V *Scott on Trusts*, §§ 511, 514.1 (3d ed. 1967 and 1978 Supp.); *Restatement of Restitution*, §§ 157, 205.

BB. Defendants Piñeiro and Goepp are entitled to a credit against those amounts due Plaintiff in Paragraph AA above, for taxes or other encumbrances and charges paid by them during the period in which they held legal title to Apartment 12–E. V *Scott on Trusts*, § 479.1 (3d ed. 1967 and 1978 Supp.); *Restatement of Restitution*, § 158, comment b. Defendants Piñeiro and Goepp are also entitled to a credit against those amounts due Plaintiff in Paragraph AA above for 0.45% of the value of Apartment 12–E for which Plaintiff's money was not the source of purchase funds.

CC. Defendants Angel Rivera Colón, Sandel Felipe García, Aracelis Martínez, Flor María García and Tomás del Carmen García González, (herein called the "Mortgagor-Defendants") are holders in good faith of bearer notes guaranteed by a mortgage over Apartment 12–E. Said Mortgagor-Defendants are third parties under the provisions of the Mortgage Law, and hence their liens over Apartment 12–E are valid. See 30 L.P.R.A. Sec. 2355. To the extent by which said Mortgagor-Defendants execute judgments against Apartment 12–E by virtue of their secured notes, Defendants Piñeiro and Goepp jointly and severally, shall indemnify Plaintiff in a sum equivalent to the decrease in value of Plaintiff's interest by virtue of the discharging of such encumbrances. In the alternative, Plaintiff may seek an order from this Court requiring that Defendants Piñeiro and Goepp, jointly and severally, be required to discharge all encumbrances outstanding to the Mortgagor-Defendants. V *Scott on Trusts*, § 521.5 (3d ed. 1967 and 1978 Supp.).

The Clerk shall enter Judgment in accordance with this Decision and Order.

IT IS SO ORDERED.